# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILINOIS
# EASTERN DIVISION

| | |
|---|---|
| CAPITOL INDEMNITY CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. |
| | ) |
| CHRISTIAN PICCIOLINI, FREE | ) |
| RADICALS PROJECT, INC., and LIFE | ) |
| AFTER HATE, INC. a/k/a EXITUSA, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Capitol Indemnity Corporation ("Capitol"), for its Complaint for Declaratory Judgment against Defendants, Christian Picciolini ("Picciolini"), Free Radicals Project, Inc. ("FRP") and Life After Hate, Inc. a/k/a ExitUSA ("LAH"), states as follows:

## NATURE OF THE ACTION

1. This action is brought by Capitol seeking a declaration that Capitol has no duty to defend or indemnify Picciolini or FRP under the insurance policy in connection with the lawsuit captioned *Life After Hate, Inc., a/k/a EXITUSA v. Free Radicals Project, Inc. and Christian Picciolini* filed in the United States District Court for the Northern District of Illinois, Case No. 18-CV-06967 (the "LAH Action"). LAH is named as a party to the extent it may have an interest in the issues being adjudicated in this action, though no

affirmative relief other than declaratory relief is sought as to LAH, in order that it may be bound by any judgment which this Court may enter.

## THE PARTIES

2.  Capitol is a Wisconsin corporation which maintains its principal place of business in Middleton, Wisconsin, that is authorized to issue insurance policies in the State of Illinois.

3.  On information and belief, Picciolini is a citizen of Illinois and a resident of Chicago, Illinois.

4.  On information and belief, FRP is an Illinois corporation which maintains its principal place of business in Chicago, Illinois.

5.  On information and belief, LAH is an Illinois not-for-profit corporation with a principal place of business at 917 West Washington Boulevard, Suite 212, Chicago, Illinois 60607.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction under 28 U.S.C. §1332(a)(1) because this is an action between citizens of different states and the amount in controversy exceeds $75,000. In addition, this Court has jurisdiction under 28 U.S.C. §2201 because an actual controversy exists between the parties.

7.  Venue is proper in this district pursuant to: 28 U.S.C. § 1391(b)(1) because Defendants reside in this district and are residents of Illinois; pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim

occurred in this district; and pursuant to 28 U.S.C. § 1391(b)(3) because, on information and belief, Defendants are subject to personal jurisdiction in this district.

## THE PRE-POLICY DISPUTES

8. On information and belief, Joseph Kuo, counsel for Picciolini, sent a letter to Floyd Mandel, counsel for LAH, on October 24, 2017. (A true and correct copy of Kuo's October 24, 2017 letter is attached hereto as Exhibit A.) In the letter, Kuo claimed that LAH was infringing on copyrights owned by Picciolini and demanded an "immediate cessation of the unauthorized use of Mr. Picciolini's likeness, as well as publication of his copyrighted works." Kuo indicated he was authorized to file a complaint attached to the letter if LAH did not comply with Picciolini's demands.

9. On information and belief, James Sipchen, LAH's "litigation counsel," sent a letter to Kuo on November 13, 2017 (the "Demand Letter"). (A true and correct copy of the Demand Letter is attached hereto as Exhibit B.) The Demand Letter alleged that LAH owned the ExitUSA trademark and that Picciolini was unlawfully holding himself out as a creator and/or purveyor of ExitUSA services. The Demand Letter also accused Picciolini of "illegally tampering with the functionality of the ExitUSA.org domain."

10. The Demand Letter also alleged that Picciolini "manipulated links" on LAH's website and elsewhere to redirect consumers who log on to ExitUSA.org to ChristianPicciolini.com.

11. The Demand Letter also alleged that Picciolini "has been able to unlawfully manipulate ExitUSA.org by his persistent refusal to transfer the domain from his personal Google account to LAH."

3

12. The Demand Letter also alleged that Picciolini ignored repeated requests from LAH that he cease his unauthorized access to, and manipulation of, ExitUSA's domain and website and that, as a result, Picciolini's conduct "constitutes willful trademark infringement and unfair competition under various state, federal and common law" and that LAH would be entitled to injunctive relief and monetary damages, costs and attorney's fees for those trademark violations.

13. The Demand Letter demanded that Mr. Picciolini:

1. Immediately cease and permanently refrain from holding himself out as a creator, contributor, or authorized purveyor of ExitUSA; otherwise stating or suggesting that [he has] any ongoing relationship, connection, or affiliation with LAH or ExitUSA[;]

2. Immediately cease and permanently refrain from using any of LAH's trademarks, including the LAH and ExitUSA marks, in any style or format, and any other marks or names composed of or containing any of LAH's marks or any variations or misspellings thereof;

3. Immediately cease and permanently refrain from tampering with and/or manipulating the ExitUSA.org domain, including but not limited to correcting any "redirects" on the Lifeafterhate.org website to the ChristianPicciolini.com website;

4. Take immediate steps to correct any mistaken interpretations that Mr. Picciolini, and not LAH, owns the ExitUSA.org website domain, including Mr. Picciolini's relinquishment of all user names, passwords, and other information in Mr. Picciolini's possession or control with respect to the ownership and registration of the ExitUSA.org domain, and its cooperation and facilitation of the transfer of the ExitUSA.org domain to its rightful founder, creator and owner, LAH; [and]

5. Destroy all unauthorized materials containing any LAH and/or ExitUSA marks or variations or misspellings, thereof, e.g. advertisements, brochures, letterheads, stationary [sic], business cards, websites, email signature lines, email domain names, etc.

14. LAH reserved its rights and remedies and advised it will take whatever action it deemed appropriate to protect its rights, interests and trademarks.

15. On information and belief, Kuo responded to Sipchen's November 13, 2017 letter on November 22, 2017. (A true and correct copy of Kuo's November 22, 2017 letter is attached hereto as Exhibit C.) In the letter, Kuo proposed that the parties agree to a division of certain assets "without having to file the attached complaint."

16. Picciolini never advised Capitol of the October 24, November 13, and November 22 letters (collectively, the "Pre-Policy Correspondence") or of the subject matter of the Pre-Policy Correspondence (the "Pre-Policy Disputes").

## THE APPLICATION FOR THE POLICY

17. Picciolini submitted a signed Miscellaneous Professional Liability Errors & Omissions Application to Capitol, dated December 27, 2017. ("Application"). (A true and accurate copy of the Application is attached hereto as Exhibit D.)

18. The Application identifies "Christian Picciolini / Goldmill Group d/b/a Sinister Muse" as the "Applicant."

19. The Application requested information regarding, among other things, prior **Claims** against the Applicant and facts and circumstances which may result in a **Claim** against the Applicant.

20. Picciolini did not disclose the Pre-Policy Correspondence or Pre-Policy Disputes in the Application.

21. In Part 16 of the Application, Picciolini indicated that he had maintained two prior policies of professional liability insurance coverage with Hiscox Insurance Company, expiring on December 28, 2016, and December 28, 2017, respectively.

## THE ISSUANCE OF THE POLICY

22. In reliance on the signed Application, Capitol issued a CapMedia and Entertainment Liability Policy under Policy No. ME20171207-01 for the **Policy Period** of December 28, 2017 to December 28, 2018 (the "Policy") to Christian Picciolini DBA Goldmill Group d/b/a Sinister Muse as the "**Named Insured**." (A true and accurate copy of the Policy is attached hereto as Exhibit E.)[1]

23. The Policy contains a Media Liability Coverage Section and a Professional Services/Technology and Internet Services Liability Coverage Section. It is undisputed that there is no coverage for the LAH Action under the Professional Services/Technology and Internet Services Liability Coverage Section. Accordingly, only the Policy's Media Liability Coverage Section is at issue in this action.

24. The Policy's Media Liability Coverage Section contains three Insuring Agreements: Insuring Agreement A. Media Liability Coverage; Insuring Agreement B. Contextual Errors and Omissions Coverage; and Insuring Agreement C. Declaratory Judgment Actions. An endorsement to the Policy's Media Liability Coverage Section also adds "Prior Acts Coverage." It is undisputed that there is no coverage for the LAH Action

---

[1] **Bold** terms are defined in the Policy.

under Insuring Agreement C. Accordingly, only Insuring Agreements A and B and the Prior Acts Coverage are at issue in this action.

## THE LAH ACTION

25. LAH initiated the LAH Action against Picciolini and FRP on October 17, 2018, by filing, among other things, a complaint and a motion for preliminary injunction.

26. LAH filed a First Amended Complaint (the "LAH Complaint") in the LAH Action on November 15, 2018. (A true and accurate copy of the LAH Complaint is attached hereto as Exhibit F.)

27. The LAH Complaint asserts causes of action for trademark infringement and counterfeiting, tortious interference with a business expectancy, deceptive trade and business practices, cyber swatting, conversion, unjust enrichment and breach of fiduciary duty. LAH seeks damages and preliminary and permanent injunctions.

28. Paragraph 9 of the LAH Complaint alleges that, by February 2014, LAH created an exit program called "ExitUSA."

29. Paragraphs 12 to 14 of the LAH Complaint allege that Picciolini was one of five founding members of LAH; a member of LAH's board of directors; administrator of LAH's digital assets, including its domain names; and Chairman of the Board of LAH.

30. Paragraph 15 of the LAH Complaint alleges that Picciolini, on behalf of LAH, negotiated for the purchase of <www.exitusa.org> (the "Domain Name") in 2015.

31. Paragraph 17 of the LAH Complaint alleges that Picciolini secretly transferred the Domain Name to his personal account without LAH's knowledge in the fall of 2016.

32. Paragraphs 24 and 25 of the LAH Complaint allege that LAH demanded Picciolini turn over all online assets and suspended Picciolini from LAH in August 2017, and Picciolini then turned over administrative access to all LAH's online accounts and assets except for LAH's @ExitUSATeam Twitter handle, "Life After Hate" and "ExitUSA" YouTube channels, and the Domain Name, but promised to transfer the Domain Name to LAH as soon as he got the chance.

33. Paragraph 27 of the LAH Complaint alleges that Picciolini emailed the president of LAH on August 23, 2017, to suggest that LAH "spin off ExitUSA" to him and asked for seed money to start his own independent organization.

34. Paragraph 28 of the LAH Complaint alleges that Picciolini then threatened that firing him would "cause confusion."

35. Paragraph 29 of the LAH Complaint alleges that Picciolini revoked the permission of LAH to use the Domain Name three days later.

36. Paragraph 30 of the LAH Complaint alleges that Picciolini then launched his own ExitUSA website on the Domain Name.

37. Paragraph 31 of the LAH Complaint alleges that LAH immediately received complaints from fellow organizations and members confused about the Domain Name.

38. Paragraph 32 of the LAH Complaint alleges that Picciolini moved all of LAH's ExitUSA accounts to his personal Gmail account in September 2017.

39. Paragraph 33 of the LAH Complaint alleges that Picciolini attempted to fraudulently federally register ExitUSA by applying to the United States Patent and Trademark Office ("USPTO") on November 13, 2017.

40. Paragraph 34 of the LAH Complaint alleges that the USPTO rejected Picciolini's application, citing LAH's identical mark for the same services.

41. Paragraph 35 of the LAH Complaint alleges that, since the second half of 2017, Picciolini has operated a business directly competing with LAH while using the Domain Name to direct viewers to their website and while including the phrase "LIFE AFTER HATE" prominently at the top of their website's home page.

42. Paragraph 36 of the LAH Complaint alleges that Picciolini incorporated as "Free Radicals Project, Inc." in May 2018 and directed FRP to purloin LAH's members and potential members so FRP could steal LAH's income and usurp control over LAH's good will.

### PICCIOLINI'S NOTICE OF THE LAH ACTION AND CAPITOL'S REQUEST FOR ADDITIONAL INFORMATION

43. Picciolini, through his insurance broker Steven Wilcox of The Rockwood Company, provided notice of the LAH Action to Capitol on October 23, 2018.

44. On November 7, 2018, Capitol wrote Picciolini, discussing potential coverage under the Policy and reserving its rights, including but not limited to its "right to disclaim coverage for this matter and/or rescind the **Policy** based upon misrepresentations in the **Application** process." (A true and accurate copy of Capitol's November 7, 2018 letter is attached hereto as Exhibit G.)

9

45. In the November 7, 2018 letter, Capitol requested additional information:

As part of Capitol's investigation into this matter, please forward to my attention copies of all correspondence between the parties to the Complaint and/or their respective counsel concerning the allegations detailed in the Complaint. If no such communications exist, please advise Capitol in writing.

46. The Pre-Policy Correspondence constitutes "correspondence between the parties to the Complaint and/or their respective counsel concerning the allegations detailed in the [LAH] Complaint."

47. Picciolini ignored Capitol's request and did not provide the Pre-Policy Correspondence to Capitol, nor did he advise Capitol in writing that no such communications exist.

### CAPITOL'S INDEPENDENT DISCOVERY OF THE PRE-POLICY CORRESPONDENCE

48. On or about February 22, 25, and 26, 2019, the court held a hearing on LAH's motion for a preliminary injunction.

49. On May 23, 2019, Picciolini and FRP filed a list of preliminary injunction exhibits, including the Pre-Policy Correspondence. (A true and accurate copy of docket entry 115-1 in the LAH Action is attached hereto as Exhibit H).

50. Capitol first learned of the Pre-Policy Correspondence as result of its independent monitoring of the LAH Action, after Picciolini and FRP filed their list of preliminary injunction exhibits.

51. In response to LAH's First Set of Requests for Admission in the LAH Action, Picciolini admitted that, as of November 2017, he "had already sent a cease and

desist letter to [LAH] and the [Demand Letter] from November 2017 was a response to Picciolini's cease and desist letter." (A true and correct copy of Picciolini's Objections and Answers to Plaintiff's First Set of Requests For Admission is attached hereto as Exhibit I.)

## COUNT I

### Declaratory Judgment
### No Coverage – Application Exclusion

52. Capitol realleges and reincorporates paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53. Picciolini signed the Application, which states, in part:

IT IS AGREED THAT WITH RESPECT TO QUESTIONS 17, 18 AND 19 THAT [IF] SUCH KNOWLEDGE OR INFORMATION EXISTS (WHETHER OR NOT DISCLOSED), IN ADDITION TO ANY OTHER REMEDY THAT THE **INSURER** MAY HAVE, ANY **CLAIM** ARISING THEREFROM WILL BE EXCLUDED FROM THIS PROPOSED COVERAGE.

(the "Application Exclusion").

54. Question 18 of the Application asked:

Does any person to be insured have knowledge of any fact, circumstance or situation or act, error or omission which may result in a **Claim** against him or the Applicant under the proposed Policy?

55. Question 19 of the Application asked:

Has any **Claim** or **Claims** been made against the Applicant or any of its predecessors in business, or any of the past or present partners, owners, officers or employees during the last five years?

56. At the time he submitted the Application, Picciolini had knowledge and information responsive to Questions 18 and 19, in particular, his knowledge of the Pre-Policy Correspondence and Pre-Policy Disputes.

11

57. The LAH Action is a **Claim** arising from the Pre-Policy Correspondence and Pre-Policy Disputes.

58. Coverage for the LAH Action is excluded by the Application Exclusion.

59. Picciolini and FRP disagree with Capitol's positions, and thus there is an actual and justiciable controversy between the parties.

WHEREFORE, Capitol respectfully requests a declaratory judgment that Capitol has no duty to defend or to indemnify Picciolini or FRP under the Policy as to the Pre-Policy Disputes, the Pre-Policy Correspondence, or the LAH Action.

## COUNT II

**Declaratory Judgment**
**No Coverage Under Insuring Agreements A and B and Prior Acts Coverage**

60. Capitol realleges and reincorporates paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61. Insuring Agreement A. of the Media Liability Coverage Section provides, in part:

> The **Company** will pay on behalf of the **Insured**, **Damages** . . . that the **Insured** becomes legally obligated to pay as the result of a **Claim** for **Media Wrongful Acts** which take place during the **Policy Period**.

62. Insuring Agreement B of the Media Liability Coverage Section provides, in part:

> The **Company** will pay on behalf of the **Insured**, **Damages** . . . that the **Insured** becomes legally obligated to pay as the result of a **Claim** for **Contextual Errors and Omissions** which take place during the **Policy Period**.

63. The Media Liability Coverage Section defines **Claim**, in part, as "a suit, written demand or written assertion of a legal right, received by any **Insured** for **Monetary Damages** or services [or] a written demand for a retraction or correction of content."

64. The Media Liability Coverage Section defines **Media Wrongful Act**, in part, as:

> any actual or alleged act, error or omission, committed by an **Insured** in the performance of **Media Activities**, including, but not limited to:
>
> * * *
>
> 3. infringement of copyright or **Title,** violation of **Droit Moral**, passing off, plagiarism, **Piracy** or misappropriation of intellectual property rights, information or ideas under an implied contract;
>
> 4. infringement or dilution of trademark, trade name, trade dress, service mark, service name or **Slogan** . . . .

65. The Media Liability Coverage Section defines **Contextual Errors and Omissions** as "any negligent act, error, omission, misstatement, misleading statement or misrepresentation in **Content** used or disseminated in **Covered Media**, by the **Insured** or with the permission of the **Insured**."

66. The Media Liability Coverage Section defines **Wrongful Acts** as "both **Media Wrongful Acts** and **Contextual Errors and Omissions**."

67. The LAH Action is a **Claim** for **Wrongful Acts** which took place prior to the **Policy Period** and **Wrongful Acts** which took place during the **Policy Period**.

68. Condition IV.B.3. of the Media Liability Coverage provides, in part:

13

All **Wrongful Acts,** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, will be treated as one **Wrongful Act** deemed to have taken place on the date of the first act, error or omission or **Wrongful Act** . . . .

69. The **Wrongful Acts** alleged in the LAH Action are treated as one **Wrongful Act** deemed to have taken place prior to the **Policy Period** because the alleged **Wrongful Acts** are based on, arise out of, directly or indirectly result from, are in consequence of, or in any way involve the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

70. Because the LAH Action is a **Claim** for **Wrongful Acts** deemed to have taken place prior to the **Policy Period**, it is not a **Claim** for **Media Wrongful Acts** or **Contextual Errors and Omissions** which take place during the **Policy Period**, and therefore the LAH Action is not covered under Insuring Agreement A or Insuring Agreement B.

71. Picciolini and FRP disagree with Capitol's positions, and thus there is an actual and justiciable controversy between the parties.

72. The Policy contains Endorsement No. 6, Prior Acts Coverage Extension (the "Endorsement"), which provides, in part:

Coverage provided under [the Media Liability Coverage Section] is hereby extended to include **Claims** arising from **Media Wrongful Acts** . . . committed during the Prior Acts Period stated below. Such **Claims** must be first made against the **Insured** and reported to the **Company** during the Reporting Period stated below.

14

  Prior Acts:   12/28/2015 to 12/28/2017

  Reporting Period: 12/28/2017 to 12/28/2018

* * *

With respect to the coverage provided under this Endorsement, the **Company** will not be obligated to pay **Damages** or **Claim Expenses** for **Claims** for or arising out of any actual or alleged:

1.  **Claim** pending as of the Effective Date of this Endorsement; or

2.  Circumstances known by the **Insured** as of the Effective Date of this Endorsement, which might reasonably be expected to result in a **Claim**.

73. The Effective Date of the Endorsement is December 28, 2017.

74. The Demand Letter alleges **Media Wrongful Acts** committed during the Prior Acts Period of December 28, 2015 to December 28, 2017, including, among other acts, Picciolini's alleged "holding himself out as a creator and/or purveyor of ExitUSA Services"; use of the ExitUSA mark without authorization; holding himself out as an authorized LAH representative; and "tampering with the functionality of the ExitUSA.org domain."

75. The Demand Letter is an actual or alleged **Claim** pending as of December 28, 2017, the Effective Date of the Endorsement, because the Demand Letter asserts LAH's legal right to certain trademarks and to monetary damages and further demands that Picciolini cease and desist from further use of the ExitUSA name and the Domain.

76. The LAH Action arises out of the Demand Letter.

77. Therefore, the LAH Action falls outside the Endorsement's Prior Acts Coverage because it arises out of any actual or alleged **Claim** pending as of December 28, 2017.

78. The Pre-Policy Correspondence alleges circumstances known by Picciolini as of December 28, 2017, the Effective Date of the Endorsement, which might reasonably be expected to result in a **Claim**, including the allegations in the Demand Letter that Picciolini was "unlawfully holding himself out as a creator and/or purveyor of ExitUSA Services"; that Picciolini was using the ExitUSA mark without authorization; that since he left LAH, Mr. Picciolini held himself out as an authorized LAH representative; and that Picciolini was "illegally tampering with the functionality of the ExitUSA.org Domain."

79. The LAH Action arises out of the circumstances alleged in the Pre-Policy Correspondence.

80. The LAH Action falls outside the Endorsement's Prior Acts Coverage because it arises out of circumstances known by Picciolini as of December 28, 2017, which might reasonably be expected to result in a **Claim**.

81. On August 26, 2019, Picciolini's counsel, Eugene Geekie, emailed Capitol's counsel on behalf of Picciolini, admitting that "the matters which were sued on [in the LAH Action] occurred during the coverage period of a prior policy, not the policy for which [Capitol is] now attempting to deny coverage based on alleged application deficiencies." Geekie's email is attached hereto as Exhibit J.

82. Picciolini and FRP disagree with Capitol's positions, and thus there is an actual and justiciable controversy between the parties.

WHEREFORE, Capitol respectfully requests a declaratory judgment that Capitol has no duty to defend or to indemnify Picciolini or FRP under the Policy as to the Pre-Policy Disputes, the Pre-Policy Correspondence, or the LAH Action.

## **PRAYER FOR RELIEF**

WHEREFORE, Capitol prays for judgment against Picciolini and FRP on each of the Counts asserted in this Complaint and for all such other and further relief as this Court deems just, appropriate, and equitable.

Dated: August 27, 2019					**SKARZYNSKI MARICK & BLACK LLP**

							By: /s/ Michael J. Rosen
							    *Attorneys for Plaintiff Capitol*
							    *Indemnity Corporation*

Michael J. Rosen (ARDC No. 6193177)
W. Joel Vander Vliet (ARDC No. 6284532)
Heidi A. Kuffel (ARDC No. 6313935)
**SKARZYNSKI MARICK & BLACK LLP**
353 N. Clark Street, Suite 3650
Chicago, IL 60654
Tel: (312) 946-4200
Fax: (312) 946-4272
mrosen@skarzynski.com
wvandervliet@skarzynski.com
hkuffel@skarzynski.com